**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

| | | |
|---|---|---|
| **CHAD CHAMBERLIAN, AND** | : | |
| **SEAN BROWN,** | : | **Case No.** |
| | : | |
| **Plaintiffs,** | : | **Jury Trial Demanded** |
| | : | |
| v. | : | |
| | : | |
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **Defendant.** | : | |

## COMPLAINT FOR DAMAGES

COME NOW Plaintiffs Chad Chamberlain and Sean Brown (collectively "Plaintiffs"), by and through their attorneys of record, and for their Complaint against Defendant United States of America state as follows:

1.     This case arises out of the May 28, 2024 crash of a Lockheed Martin F-35 Lightening II aircraft, Bureau Number 170067.

## THE PARTIES

2.     Plaintiff Chad Chamberlian, age 37 at the time of the accident, is an adult individual and citizen of New Mexico with a residence at 9308 Gutierrez Road NE, Albuquerque, New Mexico 87111.

3.     Plaintiff Chad Chamberlian, age 38 at the time of the accident, was injured in the aircraft flight accident which gives rise to this lawsuit.

4.     Plaintiff Sean Brown is an adult individual and citizen of New Mexico with a residence of 12412 Cloudview Ave NE, Albuquerque, NM 87123.

5.     Plaintiff Sean Brown was injured in the aircraft flight accident which gives rise to this lawsuit.

6. Defendant United States of America is the sovereign government of the United States.

7. At all material times, the United States, through the United States Navy Naval Air Systems Command, owned and operated the F-35B aircraft, Bureau Number 170067, involved in the incident giving rise to this action.

8. At all material times, the United States, through the United States Air Force, operates and maintains Kirtland Air Force Base in Albuquerque, New Mexico, which is immediately adjacent to the crash site.

## JURISDICTION AND VENUE

9. This civil action is brought pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b) and §§ 2671-2680.

10. Jurisdiction is vested in this Court pursuant to 28 U.S.C. § 1346(b).

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1402(b), as all Plaintiffs reside in Albuquerque, New Mexico, and the situs where the subject tort claims accrued is in Albuquerque, New Mexico.

12. Plaintiff Chad Chamberlian has been a resident of New Mexico at all times relevant.

13. Plaintiff Sean Brown has been a resident of New Mexico at all times relevant.

14. Jurisdiction and Venue is also appropriate since the accident giving rise to this action occurred in New Mexico near Albuquerque International Sunport (ABQ/KABQ), New Mexico.

## FACTUAL BACKGROUND

### *The Subject Aircraft Incident*

15.    On May 28, 2024, Plaintiff Chamberlain and Plaintiff Brown were working on Ransom Canyon season 1 for Netflix.

16.    The Director of Photographer sent Plaintiffs home to retrieve more equipment.

17.    On their way back to the set, at around 1:45 p.m., Plaintiff Chamberlain saw a plane out of his peripheral coming towards them and Plaintiff Brown yelled to alert Plaintiff Chamberlain about the jet.

18.    At approximately 1:55 p.m. local time, a United States Navy Lockheed Martin F-35B Lightning II aircraft, Bureau Number 170067, went over their black RAM truck and crashed into the berm during takeoff from Runway 21 at Albuquerque International Sunport adjacent to Kirtland Air Force Base, New Mexico.

19.    The subject aircraft is shown below:



20. The F-35B aircraft was owned by the United States Navy, Naval Air Systems Command.

21. The aircraft was being transported by an Air Force pilot, assigned to the Defense Contract Management Agency, who was traveling from Naval Air Station Joint Reserve Base Fort Worth, Texas, to Edwards Air Force Base, California.

22. The aircraft was a test jet that was equipped with Technology Refresh 2 (TR-2) and was transferring to Edwards Air Force Base for additional test equipment modification.

23. The F-35B costs about $145 million.

24. The aircraft made a stop at Kirtland Air Force Base around 1:00 p.m. to refuel.

25. Shortly after takeoff from Runway 21 at the Kirtland Air Force Base, the pilot ejected at low altitude from the aircraft before it crashed.

26. The pilot was hospitalized at University of New Mexico Hospital with serious injuries, but in stable condition.

27. The aircraft was in autopilot and since there was no one to land the aircraft, the only other option was to crash.

28. The aircraft crashed into a berm on the hillside west of University Boulevard SE, just north of Rio Bravo Boulevard SE, about 0.5 miles beyond the departure end of Runway 21, where it was immediately submerged by a huge fire.

29. The jet exploded next to the road that Plaintiffs Chad Chamberlain and Sean Brown were on.

30.     The aircraft crash into the hillside is shown below:



31.     The aircraft was destroyed, resulting in DoD property damage, environmental costs, and event costs with injuries.

32.     The short distance of Plaintiffs to the crash is shown below:



33.     Once the aircraft crashed into the hillside, the truck was thrown sideways and the airbags went off.

34.    The debris from the aircraft and aircraft parts flew through the truck bed and trailer.

35.    Plaintiffs then hit the brakes.

36.    Plaintiff Chamerblian's truck damage is shown below:



37.    Plaintiffs were unconscious for a few seconds and once they gained consciousness they got out of truck with little to no hearing for a few minutes.

38.    A witness, about half a mile ahead of Plaintiffs, came running towards them to see what happened.

39.    After that everything was a blur for Plaintiffs.

40.    EMS, Bernalillo County Fire Rescue, Albuquerque Fire Rescue Battalion One, Kirtland Air Force Base Fire Department and Albuquerque Police Department showed up to the scene.

41.    Plaintiffs stated to multiple parties that they wanted to go to a hospital, but they needed to stay until they knew what was happening with their truck.

42.    The vehicle held $208,000 worth of equipment.

43.    The vehicle and the equipment were held on site for three days.

44. At that time, Plaintiffs were within 150 ft of the burning aircraft expelling toxic fumes for about an 1 hour.

45. At that point, military personnel arrived on scene.

46. At 2:41 p.m., Plaintiffs were brought into an ambulance and examined.

47. At 2:52 p.m., Plaintiffs were released from the ambulance.

48. At 4:12 p.m., Plaintiffs were put into a second ambulance and then left the scene at 4:22 p.m. in which they were taken to University of New Mexico Hospital.

49. Exposure to a burning F-35B Lightning II presents a unique combination of extreme thermal, chemical, and physical hazards due to the aircraft's advanced composite materials, fuels, and hazardous chemical additives.

50. A burning F-35B aircraft creates complex toxic plumes that endanger nearby personnel. Approximately 40% of the F-35B's structure consists of composite plastics, including: Kevlar, graphite fibers, and bismaleimide resins.

51. Such exposure constitutes a "chemical warfare-type" risk, necessitating specialized protective protocols to prevent severe respiratory, neurological, and systemic effects.

52. The F-35B Lightning II is an advanced fifth-generation stealth fighter aircraft designed for short takeoff and vertical landing (STOVL) operations. Its advanced construction materials, including high-strength composites and various chemical coatings, enhance performance and survivability.

53. When the substantial composite materials, carbon fiber and maleimide bonder, are burned, they release highly toxic airborne particulates and fibers.

54. This creates a significant risk of health hazards.

55.     When Kevlar, graphite fibers, and bismaleimide resins are exposed to fire, these materials produce the following:

a.  Toxic smoke and gases: Including carbon monoxide, hydrogen cyanide, and other carcinogenic compounds.

b.  Carbon fiber micro- and nanofibers: These can penetrate deep into the lungs, causing inflammation, fibrosis, and other long-term respiratory complications.

c.  PFAS-containing materials: Per- and polyfluoroalkyl substances are used in coatings and fire-suppressant foams, which are persistent in the environment and linked to cancers and endocrine disruption.

56.     Hazardous metals are present in various aircraft systems:

a.  Hexavalent chromium: Used in anti-corrosion coatings; carcinogenic and highly toxic upon inhalation or dermal exposure.

b.  Cadmium: Found on landing gear and flaps; exposure can lead to kidney damage and bone disease.

57.     The F-35B also contains organophosphate (OP) compounds, primarily as:

a.  Engine oil additives: Tricresyl phosphate (TCP) and other triaryl phosphates enhance thermal stability.

b.  Hydraulic fluids: Alkyl phosphates reduce wear and maintain performance under extreme conditions.

58.     Organophosphates are potent neurotoxins that inhibit acetylcholinesterase, resulting in accumulation of acetylcholine at synapses. Acute exposure can trigger:

a.  Muscle fasciculations and tremors

b.  Severe vomiting and diarrhea

    c. Seizures and respiratory failure

59. Prolonged exposure is linked to:

    a. Cognitive impairments and memory loss

    b. Anxiety, depression, and other psychiatric disorders

    c. Neurodegenerative conditions and potential cardiovascular complications

60. Treatment requires rapid decontamination and administration of antidotes such as atropine and pralidoxime, none of which were provided to Plaintiffs.

61. There are numerous short- and long-term effects of exposure to the toxic fumes caused by an F-35B. The immediate health risks for individuals present near an F-35B fire are at risk of multiple acute health effects including, but not limited to, the following:

    a. Respiratory Effects: Wheezing, coughing, chest pain, and difficulty breathing due to inhalation of toxic smoke and microfibers.

    b. Neurological Effects: Headaches, dizziness, nausea, and temporary cognitive impairment ("brain fog") caused by chemical inhalation.

    c. Dermal and Ocular Irritation: Severe irritation of skin and eyes from exposure to airborne chemical particulates and combustion products.

62. While some of the long-term health risks for individuals who experience prolonged exposure or contact with residues from a burning F-35B can result in latent diseases, including:

    a. Cancer: Linked to PFAS compounds and carcinogenic combustion by-products.

    b. Respiratory Diseases: Chronic bronchitis, asthma, or pulmonary fibrosis due to inhaled fibers and toxic gases.

c. Neurological and Psychiatric Conditions: Long-term organophosphate exposure may induce cognitive deficits, depression, anxiety, and increased risk of neurodegenerative disease.

d. Immunotoxicity and Cardiovascular Effects: Prolonged exposure to toxic metals and chemical agents can compromise immunity and cardiovascular health.

63. At all material times, the United States had actual knowledge of the extreme health hazards created by burning F-35 composite materials.

64. When F-35 composite materials burn, they release potentially harmful airborne particles and fibers, including carbon fiber nanofibers.

65. This can cause respiratory irritation, difficulty breathing, eye irritation, and skin issues.

66. Due to Plaintiffs being so close to the crash, these toxic fumes were injected into Plaintiffs' bodies, and no masks were provided to them.

67. Additionally, Plaintiffs remained on the scene for over an hour, during which they were inhaling these toxic fumes, before they were taken to the hospital.

68. The fire at the crash site burned jet fuel (kerosene and gasoline derivatives), aviation hydraulic fluid containing phenol compounds, and was suppressed using aqueous film-forming foam (AFFF) containing FFAS and other hazardous substances.

69. The hazards from burning F-35 composite materials are not obvious or apparent to civilians unfamiliar with advanced military aircraft construction.

70. Bernalillo County Fire Rescue was the first to arrive on the scene and began fire suppression measures to extinguish the fire from the aircraft and surrounding landscape.

71.     Bernalillo County Fire Rescue was joined by Albuquerque Fire Rescue Battalion One and Kirtland Air Force Base Fire Department.

72.     The fire at the crash site burned intensely for many hours, releasing a massive plume of toxic smoke visible for miles.

73.     Albuquerque Police Department officers responded to the crash site in their official capacity as first responders to establish perimeter control, evacuate civilians, and secure the scene.

74.     A Naval crew from Jacksonville, Florida came to the scene about four days later to cleanup the area.

75.     This exact aircraft had a prior malfunction on December 15, 2022 in Fort Worth-Carswell Air Force Base in Texas, which forced that pilot to eject.

**DAMAGES**

76.     This incident caused permanent injuries to Plaintiff Chad Chamberlain and Plaintiff Brown.

77.     Plaintiff Chad Chamberlain experienced as a result of the accident:

a.  Bodily injury;

b.  Whiplash;

c.  Concussions;

d.  Intense brain fog and short-term memory loss;

e.  Chronic headaches and respiratory illnesses;

f.  Chronic fatigue, as well as elevated resting heart rates;

g.  Mood changes;

h.  Bursts of agitation;

i.  Anxiety;

11

  j. Depression;

  k. PTSD symptoms;

  l. Pain and suffering;

  m. Respiratory distress;

  n. Mental anguish;

  o. Loss of the capacity for the enjoyment of life;

  p. Unknown injuries as a result of fume exposure;

  q. Medical expenses;

  r. Lost past earnings and net accumulations;

  s. Lost future earnings and net accumulations;

  t. Pre-Judgment Interest

  u. Post-Judgment Interest; and

  v. Other damages to be determined at trial.

78. Plaintiff Chad Chamberlain has suffered two incidents of sudden unconsciousness or syncope with no immediate diagnosis. He has also suffered from heart palpitations, atrial fibrillations, and now has an internal heart monitor.

79. Plaintiff Sean Brown experienced as a result of the accident:

  a. Bodily injury;

  b. Whiplash;

  c. Concussions;

  d. Intense brain fog and short-term memory loss;

  e. Chronic headaches and respiratory illnesses;

  f. Chronic fatigue, as well as elevated resting heart rates;

g.  Mood changes;

h.  Bursts of agitation;

i.  Anxiety;

j.  Depression;

k.  PTSD symptoms;

l.  Pain and suffering;

m.  Respiratory distress;

n.  Mental anguish;

o.  Loss of the capacity for the enjoyment of life;

p.  Unknown injuries as a result of fume exposure;

q.  Medical expenses;

r.  Lost past earnings and net accumulations;

s.  Lost future earnings and net accumulations;

t.  Pre-Judgment Interest;

u.  Post-Judgment Interest; and

v.  Other damages to be determined at trial.

80.    Plaintiffs still experience pain and now require ongoing treatment.

81.    Plaintiff Sean Brown has had a chronic wet cough, wheezing, and postnasal drip since the accident.

***The United States' Delayed Response and Failure to Warn***

82.    Given the chemical and physical hazards that arise from a crash site, the military classifies F-35B fire sites as high-risk environments requiring the following protocols:

13

a.  Specialized Personal Protective Equipment (PPE): Full-body chemical suits, respirators, and eye protection.

b.  Decontamination Protocols: Immediate removal and containment of hazardous residues.

c.  Environmental Monitoring: Air quality assessment for organophosphate, PFAS, and metal contaminants.

83.    At the time of Plaintiffs Chad Chamberlain and Sean Brown's exposure, neither of them were given appropriate personal protective equipment, including P-100 half or full face respirators, Tyvek suits, and gloves to avoid the close contact of burning composite material or composite fiber debris from F-35 aircraft.

84.    Plaintiffs were also kept at the crash site for about 2 hours without protective equipment.

85.    Plaintiffs were not warned by military personnel from Kirtland Air Force Base, the United States Air Force, the United States Navy, or any other federal agency about the extreme health hazards posed by proximity to the burning F-35B wreckage.

86.    They were not instructed to stay at least 330 feet from the mishap site, to remain upwind of the smoke plume, to stay out of the hot zone, or to wear respiratory protection.

87.    They were not informed that the burning composite materials from F-35 aircraft release potentially harmful airborne particles and fibers.

88.    Kirtland Air Force Base personnel eventually arrived at the scene, but only after Plaintiffs had already been exposed to toxic substances for approximately an hour without warning or protective equipment.

14

89.     Upon information and belief, by the time military personnel from Kirtland Air Force Base arrived, Plaintiffs had already sustained prolonged unprotected exposure to hazardous substances in violation of mandatory federal safety protocols.

90.     The Navy Region Southeast On-scene Coordinator program did not arrive from Naval Air Station Jacksonville, Florida, until June 1, 2024 (four days after the incident) and only at that point assumed command of the site for environmental recovery operations.

91.     On June 6, 2024, over a week after the incident, the Department of the Navy sent correspondence to the City of Albuquerque Office of Emergency Management describing for the first time the health hazards of exposure to burning composite fibers and the appropriate personal protective equipment that should have been worn during the initial response.

### *Mandatory Federal Regulations Governing F-35 Crash Response*

92.     The United States Department of Defense has enacted specific and mandatory regulations governing the response to military aircraft mishaps, including F-35 crashes, which apply to all Department of Defense Compartments, including the United States Navy and the United States Air Force.

93.     Department of Defense Instruction (DoDI) 6055.07, titled "Mishap Notification, Investigation, Reporting, and Record Keeping," imposes mandatory duties that are directly relevant to this incident.

94.     DoDI 6055.07 explicitly lists "Protecting the public from risk of death, injury, [and] illness" as official DoD policy.

95.     DoDI 6055.07 provides that the DoD Component owning or controlling the facility where a mishap occurs, or the DoD Component that is geographically closest, "shall secure,

protect, document, and preserve" the mishap site to prevent contamination or removal of evidence until an authorized representative arrives.

96. The regulation uses the mandatory term "shall" and prescribes a specific course of action.

97. Department of the Air Force Instruction (DAFI) 91-204, titled "Safety Investigations and Reports," contains additional mandatory provisions governing mishap site management.

98. DAFI 91-204 provides that Interim Safety Board (ISB) members "will not" perform duties as the incident commander or otherwise assume overall authority for the mishap site. The ISB is only there to investigate.

99. DAFI 91-204 mandates that the Incident Commander "will ensure" only those with a legitimate need are included on an entry access list (EAL) for the mishap site. If Plaintiffs were injured because they were allowed into a dangerous area or because the area wasn't properly cordoned off, the Incident Commander is the official responsible for that failure.

100. DAFI 91-204 requires the ISB to coordinate with the Incident Commander to ensure proper personal protective equipment is worn to protect against composite materials and other hazardous materials at the mishap site.

101. Air Force emergency management regulation DAFI 10-2501 and installation-level crash recovery plans require that responders do not approach the crash site until cleared by the Incident Commander, with evidence not to be moved unless it poses immediate safety issues.

102. Naval Aviation Safety Program instruction (OPNAVINST 3750.6T) mandates that "all responsible parties will implement" naval aviation safety policies, incorporating DoDI 6055.07 for naval aviation safety investigations.

16

***<u>The United States' Violations of Mandatory Regulations</u>***

103.    Despite these specific and mandatory regulations, the United States, acting through the United States Navy, the United States Air Force, and Kirtland Air Force Base personnel, failed to secure, protect, document, and preserve the mishap site as required by DoDI 6055.07.

104.    The United States allowed civilians, to remain in dangerous proximity to the burning F-35B wreckage for over an hour without establishing proper access controls as required by DAFI 91-204.

105.    The United States failed to establish an Incident Commander at the crash site who would control access to the mishap site and ensure only those with legitimate need were allowed to approach, as required by DAFI 91-204.

106.    The United States failed to establish an Entry Access List (EAL) to control who was authorized to be present at the mishap site, as required by DAFI 91-204.

107.    The United States failed to coordinate with civilians regarding proper personal protective equipment to protect against composite materials and other hazardous materials at the mishap site, as required by DAFI 91-204.

108.    The United States failed to instruct or require Plaintiffs to maintain the minimum 330-foot standoff distance from the burning wreckage as recommended by F-35 crash response protocols.

109.    The United States failed to warn Plaintiffs to use N-95/P-100 respiratory protection, to stay out of the hot zone, and to remain upwind of the toxic smoke plume, as required by F-35 crash response protocols.

110. The United States failed to inform Plaintiffs of the specific health hazards posed by burning F-35 composite materials, including the release of potentially harmful airborne particles and fibers.

111. The United States failed to establish proper scene control procedures to prevent prolonged unprotected exposure of civilians to the known hazards of burning composite materials, jet fuel, aviation hydraulic fluid, and AFFF.

112. The United States failed to provide any hazard briefing, safety instructions, or protective equipment to Plaintiffs before, during, or immediately after their exposure.

113. The United States failed to promptly dispatch qualified military personnel to the crash site to establish incident command, control civilian access, and provide critical safety information as required by its mandatory regulations.

114. Upon information and belief, the United States Navy, as the owning service of the mishap aircraft, and the United States Air Force, through Kirtland Air Force Base as the geographically closest military installation, were both responsible DoD Components under DoDI 6055.07 with mandatory duties to secure and protect the mishap site.

115. Both the Navy and Air Force failed to fulfill their mandatory duties resulting in a complete absence of proper site security and civilian protection during the critical initial response period when Plaintiffs were exposed.

116. The hazards of burning F-35 composite materials releasing toxic nanofibers and other airborne particulates are not obvious dangers that a reasonable civilian would recognize without specialized knowledge of advanced military aircraft construction.

117. These are hidden, insidious hazards that require specific technical knowledge to identify and protect against; knowledge that the United States possessed but failed to communicate to Plaintiffs.

118. The United States had mandatory regulatory duties under DoDI 6055.07 to secure and protect the mishap site, and mandatory duties under DAFI 91-204 to establish an Incident Commander, create an Entry Access List, and coordinate PPE requirements with civilians.

119. Plaintiffs seek recovery for injuries caused by the United States' affirmative negligence in violating mandatory safety protocols, failing to establish proper site controls as required by DoDI 6055.07 and DAFI 91-204, and failing to warn of hidden toxic hazards that were not apparent or inherent in the emergency response itself.

**FORM 95 SUBMISSION**

120. On July 8, 2024, Plaintiffs Chad Chamberlain and Sean Brown separately submitted their administrative tort claims through Standard Form 95's to Defendant, properly presenting their claims to the Department of the Navy Tort Claims Unit Norfolk concerning claims for their personal injuries and property damage.

121. Plaintiff Chad Chamberlain claimed the following personal injuries caused by the accident: whiplash, concussion, neck, back, and shoulder pain, post-traumatic stress disorder, anxiety, panic attacks, lost wages, and emotional damages.

122. Plaintiff Sean Brown claims the following personal injuries caused by the accident: whiplash, concussion, neck, back, and shoulder pain, post-traumatic stress disorder, anxiety, panic attacks, lost wages, and emotional damages.

123. Plaintiffs' representatives engaged in communications with the United States following the submissions of Plaintiffs' form 95.

19

124.    The last communication Plaintiffs had with the United States was March 11, 2026.

125.    As of the date of filing this Complaint, the United States has not issued a decision on Plaintiffs' claims.

126.    Since more than six months have passed since the submission of Plaintiffs' administrative claims, Plaintiffs have exhausted their administrative remedies.

**COUNT I**
*Plaintiff v. Defendant United States of America*
**(Negligence)**

127.    Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

128.    The United States, through the United States Navy, the United States Air Force, and Kirtland Air Force Base personnel, owed a duty of reasonable care to all persons who were present at or near the F-35B crash site.

129.    Under New Mexico law, those who create or are responsible for dangerous conditions have a duty to exercise reasonable care to prevent injury to others, including a duty to warn of known hazards.

130.    The United States had actual knowledge of the extreme health hazards posed by burning F-35B composite materials, jet fuel, aviation hydraulic fluid, and AFFF fire suppression foam.

131.    The United States had actual knowledge that civilians would be at the F-35 crash site in an urban area and would require specific warnings and protective measures.

132.    The hazards from burning F-35 composite materials were not obvious or readily apparent to civilians unfamiliar with advanced military aircraft construction, as evidenced by the fact that Plaintiffs remained in dangerous proximity for over an hour without recognizing the invisible airborne hazards.

133. It was entirely foreseeable that civilians without specialized knowledge of F-35 aircraft hazards would not know to maintain safe distances, use respiratory protection, or avoid toxic smoke plumes unless specifically warned and instructed.

134. It was entirely foreseeable that prolonged unprotected exposure to burning composite materials, jet fuel combustion products, aviation hydraulic fluid, and AFFF would cause respiratory injuries, neurological symptoms, and other acute and chronic health effects.

135. The United States' own regulations, advisories, and correspondence demonstrate that it knew of these specific hazards and knew that specific warnings and protective measures were necessary for civilians.

136. The United States breached its duty of care by failing to warn Plaintiffs of these known hazards before or during their exposure.

137. The United States breached its duty of care by failing to provide Plaintiffs with any safety briefing, hazard information, or instructions regarding safe distances, wind direction, respiratory protection, or hot zone avoidance.

138. The United States breached its duty of care by failing to provide Plaintiffs with appropriate personal protective equipment or instructions on its necessity.

139. The United States breached its duty of care by failing to promptly dispatch military personnel to the crash site to provide warnings and safety instructions to civilians.

140. Had the United States provided the warnings mandated by its own F-35 crash response protocols, Plaintiffs would have maintained safe distances of at least 330 feet, positioned themselves upwind of the toxic smoke plume, and used appropriate respiratory protection.

141.    The United States' failure to warn was the direct and proximate cause of Plaintiffs' exposure to toxic substances and resulting injuries, as Plaintiffs relied on the absence of warnings in determining that their proximity to the burning wreckage was safe.

142.    If a private entity had been responsible for a dangerous condition involving toxic airborne hazards and had failed to warn persons of those known hazards, resulting in their injury, that private entity would be liable under New Mexico law.

143.    As a direct and proximate result of the United States' failure to warn, Plaintiffs suffered and continue to suffer serious injuries including intense brain fog, short-term memory loss. chronic headaches, respiratory illnesses including chest tightness and pain, shortness of breath, and overall difficulty breathing, chronic fatigue, as well as elevated resting heart rates. Plaintiffs both suffered mood changes, bursts of agitation, anxiety, depression, and PTSD symptoms. Plaintiff Brown has had a chronic wet cough, wheezing, and postnasal drip since the accident. Plaintiff Chamberlain has suffered two incidents of sudden unconsciousness or syncope with no immediate diagnosis, heart palpitations, atrial Fibrillations, and now has an internal heart monitor. Plaintiffs both suffer from pain and suffering, mental anguish and emotional distress from knowledge of toxic exposure and fear of future latent diseases, past and future medical expenses, lost wages, and loss of enjoyment of life.

144.    Likewise, the United States had a duty under New Mexico common law to exercise reasonable care in managing the F-35B crash site to prevent injury to civilians who foreseeably would respond to the scene.

145.    The United States had superior knowledge of the hazards present at the crash site, including the toxic nature of burning F-35 composite materials, and had the ability and resources to implement proper site management protocols.

146. The United States breached this duty by failing to timely secure and control access to the mishap site.

147. United States breached this duty by allowing Plaintiffs to remain in dangerous proximity to burning toxic materials for over an hour without establishing proper incident command or access controls.

148. The United States breached this duty by failing to establish and implement an Entry Access List to control which personnel were authorized to approach the crash site.

149. The United States breached this duty by failing to ensure that an authorized Incident Commander was present at the site during the critical initial response period to coordinate safety measures and control civilian responder access.

150. The United States breached this duty by failing to dispatch qualified military personnel to the crash site in a timely manner to assume incident command and implement safety protocols.

151. The United States breached this duty by failing to establish hazard zones, maintain appropriate standoff distances, and ensure civilians remained upwind of toxic smoke plumes.

152. The United States breached this duty by failing to implement decontamination protocols required for personnel exposed to burning composite materials.

153. It was entirely foreseeable that civilians would be at an aircraft crash site in an urban area near a major metropolitan airport.

154. It was entirely foreseeable that without proper site management, including establishment of incident command, access controls, and safety protocols, civilians would be exposed to toxic hazards.

155. The United States' failure to implement proper site management directly caused Plaintiffs to remain in the hot zone for over an hour, inhaling toxic substances without respiratory protection.

156. But for the United States' failure to establish proper site controls, Plaintiffs would not have sustained their injuries.

157. If a private entity had been responsible for managing a site involving burning toxic materials and had failed to implement basic safety controls, resulting in injury to persons at the site, that private entity would be liable under New Mexico law.

158. As a direct and proximate result of the United States' negligent site management, Plaintiffs suffered and continue to suffer serious injuries including intense brain fog, short-term memory loss. chronic headaches, respiratory illnesses including chest tightness and pain, shortness of breath, and overall difficulty breathing, chronic fatigue, as well as elevated resting heart rates. Plaintiffs both suffered mood changes, bursts of agitation, anxiety, depression, and PTSD symptoms. Plaintiff Brown has had a chronic wet cough, wheezing, and postnasal drip since the accident. Plaintiff Chamberlain has suffered two incidents of sudden unconsciousness or syncope with no immediate diagnosis, heart palpitations, atrial Fibrillations, and now has an internal heart monitor. Plaintiffs both suffer from pain and suffering, mental anguish and emotional distress from knowledge of toxic exposure and fear of future latent diseases, past and future medical expenses, lost wages, and loss of enjoyment of life.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendant United States of America and in favor of Plaintiffs on all counts, award compensatory damages to each Plaintiff in amounts to be determined by the trier of fact, award pre-judgment and

post-judgment interest as allowed by law, award costs of suit, and grant such other and further

relief as the Court deems just and proper.

Respectfully submitted,

DATHAN WEEMS LAW FIRM, LLC

*/s/ Dathan Weems*
Dathan L. Weems, Esq.
Sarah K. Jaeger, Esq.
*Attorneys for Plaintiffs*
106 Wellesley Dr. SE
Albuquerque, NM 87106
Phone: (505) 247-4700
dathan@weemslaw.com
sarah@weemslaw.com